# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

DAVID ERICKSON, ROBERT
GRIGGS, and DIANHAI DU,

                     Plaintiffs,

v.

JEFFERY HORING, RAMANAN
RAGHAVENDRAN, INSIGHT
CAPITAL PARTNERS II, LP, INSIGHT
CAPITAL PARTNERS III, LP, INSIGHT
CAPITAL PARTNERS (CAYMAN) II,
LP, INSIGHT CAPITAL PARTNERS
(CO INVEST) III, LP, WI SOFTWARE
INVESTORS, LLC, IMPRIMIS SB, LP,
W-E INVESTORS, LLC, and ELIANCE
CORPORATION,

                     Defendants.

Civil No. 99-1468 (JRT/FLN)

**MEMORANDUM OPINION
AND ORDER**

Michael C. Mahoney and Mark W. Peery, MAHONEY & HAGBERG, 109
Bushaway Road, Wayzata, MN 55391, for plaintiffs.

Howard J. Kaplan and Sean O'Brien, ARKIN KAPLAN & COHEN, 520
Madison Avenue 35th Floor, New York, NY 10022, for defendants Insight
Capital Partners II, L.P., Insight Capital Partners (Cayman) II, L.P., Insight
Capital Partners III, L.P., Insight Capital Partners (Cayman) III, L.P.,
Insight Capital Partners (Coinvest) III, L.P.

J Jackson, J. Thomas Vitt, Kristin S. Westgard, and Kevin C. Braley,
DORSEY & WHITNEY, Pillsbury Center South, 220 South Sixth Street,
Minneapolis, MN 55402, for defendants eliance Corporation, Jeffery
Horing, and Ramanan Raghavendran.

**SEP 21 200\***

FILED _____

RICHARD D. SLETTEN, CLERK

JUDGMENT ENTD. _____

DEPUTY CLERK _____

Wendy Wildung and Lianne C. Knych, FAEGRE & BENSON, 2200 Norwest Center, 90 South Seventh Street, Minneapolis, MN 55402-3901, for defendants WI Software Investors L.L.C., Imprimis SB, L.P., and WE Investors L.L.C.

On October 23, 2000, the Court granted defendants' motion to dismiss plaintiffs' counterclaim alleging securities fraud under section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. § 240.10b-5, on the basis that plaintiffs failed to allege their claim with sufficient particularity pursuant to Rule 9(b) of the Federal Rules of Civil Procedure and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4.

Although the Court dismissed plaintiffs' counterclaim, the Court granted plaintiffs leave to assert their fraud and indemnification claims in a second amended complaint, which plaintiffs did on November 10, 2000.   Defendants Insight,[1] Jeffery Horing ("Horing"), Ramanan Raghavendran ("Raghavendran"), and Wexford[2] now move to dismiss plaintiffs' 10b-5 claim alleged in Count I of the second amended complaint on the basis that the complaint still fails to satisfy the pleading requirements of Rule 9(b) and the PSLRA.   Additionally, since the time the Court dismissed plaintiffs' 10b-5 claim, a Hennepin County District Court Judge granted summary judgment as to plaintiffs' state statutory and common law fraud claims in a parallel proceeding involving the same

---

[1] Insight collectively refers to: Insight Capital Partners II, L.P., Insight Capital Partners (Cayman) II, L.P., Insight Capital Partners III, L.P., Insight Capital Partners (Cayman) III, L.P., and Insight Capital Partners (Coinvest) III, L.P.

[2] Wexford collectively refers to:  WI Software Investors, L.L.C., Imprimis SB, L.P., and WE Investors, LLC.

parties and the same operative facts.  Defendants Insight, Horing and Raghavendran thus also allege that plaintiffs' federal securities fraud claim is barred by collateral estoppel.[3] For the reasons set forth below, the Court grants defendants' Insight, Raghavendran, Horing and Wexford's motions to dismiss Count I of the second amended complaint.

## BACKGROUND

### I.    History of this Action

Nearly two years ago, plaintiffs David Erickson ("Erickson"), Dianhai Du ("Du"), and Robert Griggs ("Griggs") commenced this action in the name of eliance corporation ("eliance").  Plaintiffs initially sued in order to void certain actions taken by eliance's Board of Directors on the basis that the Board had acted without authority.  Specifically, the complaint alleged that on May 12, 1999, the Board unlawfully reduced the number of directors from seven to five in violation of Article 2.2 of the eliance bylaws and fraudulently and falsely represented that Griggs and Deborah Farstad resigned from the Board.  These actions, plaintiffs alleged, were taken by, or at the direction of, defendants Jeffery Horing ("Horing") and Ramanan Raghavendran ("Raghavendran") on behalf of Insight, a venture capital group, in an effort to take control of eliance and act against the best interests of the corporation.

---

[3] Defendant eliance corporation also moves to dismiss the indemnification claim alleged in Count II of the second amended complaint, however, on June 26, 2001, a bankruptcy petition was filed against eliance, thus staying all proceedings against it.  [Docket No. 179.]

Within a week, defendants counterclaimed and sought injunctive relief to enjoin unauthorized actions taken by plaintiffs[4] and to return control of eliance to the lawful board of directors. On October 4, 1999, the Court issued a temporary restraining order in defendants' favor and shortly thereafter, ruled on defendants' motion for a preliminary injunction. In its analysis, the Court first determined that plaintiffs most likely did not have authority to act on behalf of eliance, and therefore they and their counsel had no right to sue in eliance's name. The Court thus substituted plaintiffs for eliance as the real parties in interest.

With respect to the merits of defendants' motion, the Court found that eliance would suffer irreparable harm if the corporate governance issues were not resolved expeditiously. The Court further determined that defendants had a strong likelihood of succeeding on the merits of their counterclaim:

> Given the duly and presumptively valid Certificate of Amendment as well as the facially valid underlying corporate documents, it is highly likely that defendants will succeed in showing that the number of directors was changed from seven to five. The Court therefore finds that there is a strong

---

[4] Documents submitted as part of defendants' motion revealed that shortly before filing suit in 1999, Erickson, signing for himself and for Deborah Farstad, Griggs, Du, and Shelley Knight as their proxies, executed a "Minutes of Written Consent of Majority of the Stockholders of eliance Corporation" purporting to elect Erickson, Deborah Farstad, Griggs, and Du to the board. A document titled "Secretary's Certificate of Special Meeting of Directors" dated September 27, 1999 recites, *inter alia*, that Erickson, Griggs, and Joel Metz were appointed as corporate officers. The document also appointed Mahoney, Hagberg & Rice as eliance's corporate counsel, ratified a retainer fee of $495,000, and authorized the commencement of this lawsuit. Defendants also alleged that during the week of September 27, 1999, Erickson and his supporters apparently took over the Eden Prairie facility, denied access to director Ramanan Raghavendran and Chief Operating Officer Laura Hantho, told employees that Kerry Adler had been removed as President and CEO, and canceled the corporate credit cards of various employees, including Laura Hantho and Kerry Adler. Erickson also approved the wire transfers of funds, in particular $495,000 to Mahoney, Hagberg & Rice.

probability that defendants and counterclaimants will succeed on the merits
of their counterclaims.

October 15, 1999 Order at 11. Accordingly, the Court granted defendants' motion for a
preliminary injunction and declared David Erickson, Jeffery Farstad, Glenn Osaka,
Jeffery Horing, and Ramanan Raghavendran to be the duly elected directors of eliance
and enjoined plaintiffs from purporting to act on behalf of eliance.

Shortly after the Court ruled on these motions, plaintiffs filed a parallel action in
Minnesota state court against defendants, alleging twelve causes of action, including state
statutory and common law fraud claims. Plaintiffs then filed a pleading in this case on
March 23, 2000 which purported to assert a "counterclaim in reply" based on federal
securities law as well as a counterclaim for indemnification under Delaware law.

On October 23, 2000, the Court dismissed plaintiffs' first amended complaint for
lack of diversity jurisdiction. The Court also dismissed plaintiffs' counterclaim on the
basis that plaintiffs failed to plead their fraud claim with specificity as required under
Rule 9(b) and the PSLRA, but granted plaintiffs leave to cure their defective pleading by
filing a second amended complaint within 20 days of the Court's Order. *See* October 23,
2000 Order at 22-26 (interpreting plaintiffs' amended counterclaim filed while
defendants' motion to dismiss was pending as a motion to amend their complaint under
Rule 15(a)).

## II.    The Second Amended Complaint

Plaintiffs filed their second amended complaint on November 10, 2000 pursuant to
the Court's October 23, 2000 Order. In Count I, plaintiffs allege, as they did in their

- 5 -

counterclaim, a violation of section 10b of the Securities Exchange Act of 1934.  This
claim arises from fraudulent representations that defendants allegedly made to induce
plaintiffs to sell their interests in Dakotah Marketing Research ("DMR") in exchange for
interests in eliance.  In Count II, plaintiffs assert a claim for indemnification against
eliance in their capacity as officers and directors of eliance for costs, fees and expenses
incurred in connection with this litigation.[5]

The events giving rise to these allegations are as follows.  Between 1995 and
1998, plaintiffs were members and held interests in DMR.  DMR's business primarily
involved processing credit card transactions for on-line retailers through its North
Dakota-based call center, with the assistance of DMR-developed software technology
that allows for virtually instantaneous credit card processing.

Plaintiffs allege that in December 1998, Raghavendran, a partner or principal of
each of the Insight partners and on behalf of the Venture Partners,[6] contacted Erickson,
then President of DMR, about investing in DMR.  According to plaintiffs, Raghavendran
stated that the Venture Partners were willing to make a significant investment in DMR,
first in the form of a loan and then by an equity investment.  Sometime in January 1999,
Raghavendran and Horing, also a partner or principal of Insight, presented Erickson and
other DMR members with written materials from the Venture Partners describing the

_____

[5] As previously mentioned, eliance's motion to dismiss Count II of plaintiffs' second
amended complaint is no longer before the Court in light of the bankruptcy petition filed against
eliance on June 26, 2001.

[6] In paragraph 12 of the complaint, the Venture Partners refer collectively to the Insight
Partners and the Wexford Partners.

$2,000,000 proposed loan and assurance of additional money, if needed.  According to plaintiffs, the written materials and statements made by Raghavendran and Horing falsely represented that the Venture Partners had significant experience in investing in internet companies; only invested passively and never took a role in managing the affairs of companies in which they invested; and could assure DMR of an initial public offering ("IPO") by the end of 1999 and would assist in any financing needed.  Plaintiffs further allege that Raghavendran and Horing failed to disclose that the Venture Partners' true plan and objective was to create a new Delaware corporation into which DMR would merge and that in the process, plaintiffs would lose most, if not all, of the rights and benefits they enjoyed as DMR members.

On January 10, 1999, Raghavendran, Horing and [Gregory] Grimaldi, met with plaintiffs and other DMR members at DMR's business office in Minneapolis.  At this meeting, plaintiffs allege that Raghavendran, Horing and Grimaldi sought to persuade plaintiffs to sell their DMR interests in exchange for interests in a successor Delaware Corporation (eliance) into which the Venture Partners would invest significant sums of money and assist in the process of taking the company public by late 1999.  Specifically, plaintiffs allege that the Venture Partners, by and through their agents, made numerous representations to plaintiffs, including:

- That the Venture Partners, and its principals, would act only as "value-added" partners to the management of eliance, and that plaintiffs would retain all of their then existing agreements and rights and would be guaranteed control of their business;

- 7 -

- That the Venture Partners would not attempt to take control of the business and would always act as a minority investor who would work with plaintiffs;

- That the Venture Partners build their relationships based upon trust, experience, knowledge and empathy;

- That the Venture Partners, and their principals, had special expertise in software investing, public offerings and mergers, and could and would bring DMR to the public market with a substantial initial public offering within a short period of time;

- The Venture Partners promised that their experience and connections in the software industry and their significant capital would assist plaintiffs in their goals without their losing control of their business.

On January 14, 1999, defendants sent DMR a Term Sheet under which the Venture Partners proposed to lend $2,000,000 to DMR and additional investments of up to $18,000,000. At the same time, Raghavendran and Horing delivered various written proposals and talked with plaintiffs Erickson, Griggs and Farstad about the investments, again allegedly repeating the misrepresentations discussed above. Raghavendran and Horing also insisted that because DMR was a North Dakota limited liability company it was necessary for the DMR members to convert their DMR interests into common stock and that Delaware was the best state in which to be incorporated. In convincing plaintiffs to proceed with this plan, plaintiffs allege that in various meetings at unspecified times, Raghavendran and Horing told plaintiffs that the Delaware corporation would be exactly like DMR with exactly the same rights and protections under the law and the various

agreements; that the DMR interest holders would have exactly the same rights under the Delaware corporation as they had in DMR; and that the DMR interest holders were guaranteed the perpetual right to elect four of seven directors.   Again, these representations, plaintiffs allege, were intended to persuade plaintiffs and others to sell their DMR interests in exchange for eliance common stock and that plaintiffs relied on these representations to their detriment.  Plaintiffs further claim that these representations were false because they failed to disclose the Venture Partners' true intention to take control of DMR and dilute plaintiffs' ownership interests in DMR.

On January 15, 1999, based on all the promises and representations made by the Venture Partners through their agents Raghavendran and Horing, the parties entered into a purchase agreement incorporating the terms of the January 14, 1999 Term Sheet to lend DMR  $2,000,000.  Sometime in March 1999, Raghavendran introduced Erickson and Griggs to attorneys at Hale & Dorr, LLP, who were to prepare the documents creating the Delaware corporation.   Plaintiffs allege that Raghavendran did not disclose that Hale & Dorr was regularly and routinely retained by the Venture Partners, nor did he disclose that the documents and materials being prepared would contain subtle differences which would negate the various promises upon which plaintiffs were making their investment decisions.

On or about March 4, 1999, under the direction and with the advice of its own counsel, DMR called a meeting to consider the merger with the Delaware corporation. On March 11, 1999, the merger of DMR with Eliance became effective.  It is this transaction, whereby membership interests in DMR were exchanged for shares of eliance,

that form the basis of plaintiffs' fraud allegations.  Specifically, plaintiffs allege that as of this date, eliance was owned and controlled by the Venture Partners when it issued its common stock in exchange for plaintiffs' DMR interests.  As a result of the merger and the agreements, plaintiffs claim they were unknowingly stripped of virtually all of the agreements that had been in place at DMR.

To demonstrate that the foregoing statements were fraudulent at the time they were made, plaintiffs rely on the actions taken by the Venture Partners after the March 1999 merger.  Specifically, plaintiffs allege that: 1) defendants immediately began to use their position of trust, the status they created for themselves as senior lenders and major shareholders to take over the Board of Directors in direct contradiction to their earlier representations; 2) on May 12, 1999, defendants recommended that two of the directors (Griggs and Farstad) resign so that the number of directors could be reduced from seven to five; 3) on July 27, 1999, defendants caused eliance to sell all or substantially all of eliance's sources of revenue from its adult entertainment business to Texas Internet Processing Inc. ("TIPS") and the Chavoya group, both of which are affiliated with Insight, a fact which plaintiffs allege was not disclosed to them at the time of the sale; 4) on December 29, 1999, the Venture Partners caused the eliance Board of Directors to approve a contract to sell the assets of eliance to BlueSky (now known as Webhelp, Inc.) for woefully insufficient consideration and causing plaintiffs to lose all value of their investments in eliance; and 5) having sold eliance to Webhelp, the Venture Partners abandoned all efforts to take eliance public as promised in 1999 and were now engaged in an effort to complete the IPO for Webhelp instead.

As a direct result of defendants' fraudulent representations and plaintiffs' reliance on them, plaintiffs allege that the Venture Partners have taken everything of value in eliance for a mere pittance, secured millions for themselves and left plaintiffs as holders of eliance common stock that has little or no value.

## ANALYSIS

### I.   Standard of Review

In considering defendants' motion to dismiss, the Court must accept as true all the factual allegations set forth in plaintiffs' complaint and must draw all reasonable inferences in favor of plaintiffs. *Westcott v. City of Omaha*, 901 F.2d 1486, 1488 (8th Cir. 1990).   The Court need not accept as true legal conclusions or unwarranted factual inferences, however. *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987). Also, where relevant, the Court may consider documents relied upon in plaintiffs' complaint and of undisputed authenticity, even though they are not physically attached to the pleading.  *Vizenor v. Babbit*, 927 F. Supp. 1193, 1198 (D. Minn. 1996).

To recover in a private action brought under Rule 10b-5, plaintiffs must establish that defendants made misrepresentations or omissions of material fact with the intent to deceive, manipulate or defraud; that plaintiffs relied on these misrepresentations or omissions, damages, and that the fraudulent activity occurred in connection with the purchase and sale of a security. *In re Nationsmart Corp. Sec. Litig.*, 130 F.3d 309, 320 (8th Cir. 1997).   Rule 9(b) requires that claims of fraud set forth the circumstances constituting fraud "with particularity."  To meet this standard, plaintiffs must allege the time, place and contents of the false representations, as well as the identity of the person

making the misrepresentation and what was obtained or given up thereby. *Parnes v. Gateway 2000, Inc.*, 122 F.3d 539, 549 (8th Cir. 1997). In addition, in the securities fraud context, Rule 9(b) requires the pleading to set forth facts explaining why it is claimed that the representations were known by each of the defendants to be untrue or misleading when they were made. *In re Buffets, Inc. Sec. Litig.*, 906 F. Supp. 1293, 1300 (D. Minn. 1995).

The PSLRA similarly creates a heightened standard for pleading a federal securities fraud claim, providing in relevant part:

> [T]he complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u-4(b)(1). In addition, the PSLRA requires that the specific facts set forth in a complaint create a strong inference of fraudulent intent:

> In any private action arising under this chapter in which plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u-4(b)(2). Under § 4(b)(3) of the PSLRA, "in any private action arising under this chapter, the court shall, on the motion of any defendant, dismiss the complaint if the requirements of paragraphs 1 and 2 are not met."

- 12 -

## II.   Defendants Insight, Horing and Raghavendran's Motions to Dismiss

Defendants Insight, Horing and Raghavendran move to dismiss Count I of plaintiffs' second amended complaint on the basis that plaintiffs' 10b-5 claim is barred by the doctrine of collateral estoppel.  Defendants also move to dismiss the complaint because it fails to meet the pleading requirements of Rule 9(b) and the PSLRA.  For the reasons that follow, the Court finds that collateral estoppel bars plaintiffs' claims.

### A.   Collateral Estoppel

Defendants Insight, Horing, and Raghavendran argue that collateral estoppel bars plaintiffs from relitigating essentially the same issue already litigated and decided by the state court.  In a parallel state court action involving the same parties and the same operative facts as those alleged in plaintiffs' second amended complaint, plaintiffs sued defendants alleging twelve claims, including claims for fraud under the Minnesota Securities Fraud Act, Minn. Stat. §§ 80A.01 *et seq.*, and under the common law.  On November 20, 2000, shortly after plaintiffs were given a second opportunity to file their federal securities fraud claim in this Court, Hennepin County District Court Judge Diana S. Eagon granted defendants' motion for summary judgment on all but one of plaintiffs' claims in the state court action.[7]  Significantly, Judge Eagon concluded that

_____

[7] Plaintiffs suggest that defendants improperly submitted matters outside the pleadings by attaching the state court's November 20, 2000 Order and Memorandum.  While a court must generally ignore materials outside the pleadings on a 12(b)(6) motion, courts may nevertheless consider "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint."  5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure: Civil 2d* § 1357, at 299 (1990).  In this instance, reference to and reliance upon the state court's order is, by its very nature, necessary to properly analyze defendants' motion to

(Footnote continued on next page.)

plaintiffs failed to state a claim for fraud and dismissed those claims with prejudice. Defendants thus argue that because plaintiffs' federal securities fraud claim is essentially the same claim as plaintiffs' state statutory and common law fraud claims, the Court should apply collateral estoppel to Count I of plaintiffs' second amended complaint.

Plaintiffs maintain that collateral estoppel does not apply because the issues in the state court action were not "fully litigated," the decision was not a "final judgment," and the issues raised in the state court are not the same as those raised in federal court.[8]

It is well-settled that, under 28 U.S.C. § 1738, a federal court must give a state court judgment the same preclusive effect as would be given the judgment under the law of the state in which the judgment was rendered. *Gopher Oil Co. v. Bunker,* 84 F.3d 1047, 1051-52 (8th Cir. 1996) ("We accord full faith and credit to state court judgments, giving them the same preclusive effect in federal court as they would have in state court."). This analysis applies even for claims of exclusive federal jurisdiction. *Matsushita Elec. Indus. Co. Ltd. v. Epstein,* 516 U.S. 367, 374 ("§ 1738 is not irrelevant simply because the judgment in question might work to bar the litigation of exclusively federal claims"); *Marrese v. American Academy of Orthopedic Surgeons,* 470 U.S. 373,

---

(Footnote continued.)
dismiss based upon collateral estoppel. *Porous Media Corp. v. Pall Corp.*, 186 F.3d 1077, 1079 (8th Cir. 1999) (district court properly relied upon transcript of proceeding in prior litigation to analyze whether to grant motion to dismiss on malicious prosecution claim).

[8] Plaintiffs also allege, without any case support, that collateral estoppel cannot be raised on a motion to dismiss because it is an affirmative defense. Caselaw, however, clearly provides otherwise. *See Sanders v. Department of the Army,* 981 F.2d 990, 991 (8th Cir. 1992) (district court did not have to require formality of amended answer, and properly exercised discretion to allow government to raise affirmative defense for first time in motion to dismiss, which was sufficient notice to plaintiff); *Coates v. Kelley,* 957 F. Supp. 1080, 1086 (E.D. Ark. 1997); *Schaafsma v. Marriner,* 634 F. Supp. 812, 813 (D. Vt. 1986) ("Defendant may raise the affirmative defense of res judicata and collateral estoppel in a motion to dismiss.").

- 14 -

381 (1985) ("state law determines at least the . . . preclusive effect of a prior state judgment in subsequent action involving a claim within the exclusive jurisdiction of the federal courts").  Accordingly, in determining whether plaintiffs' 10b-5 claim alleged in Count I of plaintiffs' second amended complaint is precluded by the previous state court litigation, the Court looks to state law.  Under Minnesota law, collateral estoppel applies if:

> 1) the issue was identical to one in a prior adjudication; 2) there was a final judgment on the merits; 3) the estopped party was a party or in privity with a party to the prior adjudication; and 4) the estopped party was given a full and fair opportunity to be heard on the adjudicated issue.

*Willems v. Commissioner of Pub. Safety,* 333 N.W.2d 619, 621 (Minn. 1983); *Ellis v. Minneapolis Comm'n on Civil Rights,* 319 N.W.2d 702,704 (Minn. 1982); *Saudi American Bank v. Azhari,* 460 N.W.2d 90, 92 (Minn. Ct. App. 1990).

From the outset, the Court notes that the third factor of the test, whether the estopped party was a party in the prior adjudication, is clearly met in this case.  Plaintiffs Erickson, Griggs and Du are the same plaintiffs as in the state court action.  Having determined that the third requirement as delineated above is satisfied, the Court proceeds to the other requirements.

1.      **Identity of Issues**

With respect to the first element, identity of issues, the Court agrees with defendants that the issues to be decided in this case regarding plaintiffs' 10b-5 claim are "identical" to the issues already litigated and decided in the state case regarding plaintiffs' state statutory and common law fraud claims.  The language of Minn. Stat.

§ 80A.01 and Rule 10b-5 are almost identical.[9]   Indeed, Minn. Stat. § 80A.31 expressly

provides that "sections 80A.01 to 80A.31 shall be so construed as . . . to coordinate the

interpretation of sections 80A.01 to 80A.31 **with the related federal regulation.**"

(Emphasis added.)  Moreover, the elements of an action under Minn. Stat. § 80A.01 are

essentially the same as those of a fraud claim under 10b-5.  Both statutes require a

misrepresentation with scienter in connection with a transaction in a security on which

the plaintiff justifiably relied to his detriment.  *Compare Norwest Bank Midland v.*

*Shinnick,* 402 N.W.2d 818, 825 (Minn. Ct. App. 1987) *with In re NationsMart Corp. Sec.*

*Litig.,* 130 F.3d 309, 320 (8th Cir. 1997) and *Davidson v. Wilson,* 973 F.2d 1391, 1400

(8th Cir. 1993).

Consequently, in granting summary judgment against plaintiffs on their state law

claim for securities fraud and common law fraud, the state court necessarily held that

---

[9] Minn. Stat. § 80A.01 states:

It is unlawful for any person, in connection with the offer, sale or purchase of any security, directly or indirectly:  (a) to employ any device, scheme, or artifice to defraud:  (b) to make any untrue statement of a material fact or to omit to state material facts necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading; or (c) to engage in any act, practice, or course of business which operates or would operate as fraud or deceit upon any person.

17 C.F.R. § 240.10b-5 states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange, (a) To employ any device, scheme, or artifice to defraud; (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

plaintiffs did not meet the elements necessary for a claim under Rule 10b-5.  Indeed,
Judge Eagon specifically held that the alleged misrepresentations of defendants were of
future events and so could not form the basis for a fraud claim, that the alleged omissions
were not actionable, and that the alleged misrepresentations were directly contradicted by
the plain language of the later written agreements.  Nov. 20, 2000 Order at 48
("Notwithstanding the statements made in the course of negotiations, the Defendants
'spoke' further through the incorporation and merger documents, which Plaintiffs had full
opportunity to read, which were approved by the Plaintiffs' *own* attorneys, and to which
Plaintiffs affixed their signatures.  The plain language of these documents demonstrates
that they superseded prior understandings and that they were fully capable of being
amended in the future" (emphasis in original)).  *Compare Davidson v. Wilson,* 973 F.2d
1391, 1401 (8th Cir. 1992) (reliance on oral representations unreasonable as a matter of
law on plaintiffs 10b-5 claim where such oral representations contradict written
documents).

It is also noteworthy that other courts, under very similar circumstances, have
found that a state statutory or common law fraud claim asserted in state court is
"identical" for purposes of collateral estoppel to preclude a 10b-5 claim in federal court.
*See Tobias v. First City Nat'l Bank & Trust Co.,* 709 F. Supp. 1266, 1268-71 (S.D.N.Y.
1989) (finding issues identical as to plaintiffs' common law fraud claim asserted in state
court action and plaintiffs' 10b-5 claim raised in subsequent federal case); *Aries Realty,
Inc. v. Ags Columbia Assocs.,* 751 F. Supp. 444, 450-51 (S.D.N.Y. 1990) (issues identical

between state fraud claim litigated in state court action and 10b-5 claim pursued in subsequent federal action).

Further, several Eighth Circuit decisions, although not involving securities-related issues, have found issues identical and applied collateral estoppel to bar state-litigated issues from federal courts. *See Bechtold v. City of Rosemount,* 104 F.3d 1062, 1067 (8th Cir. 1997) (finding of legitimate termination on plaintiff's wrongful termination claim identical for purposes of issue preclusion to preclude litigation of that issue on plaintiff's ADEA claim); *Gopher Oil Co. v. Bunker,* 84 F.3d 1047, 1052 (8th Cir. 1996) (state court's determination that plaintiffs were not entitled to indemnity under the Minnesota Environmental Response, Compensation and Liability Act (MERLA) estops claim for indemnity under federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA)).

Pursuant to the foregoing analysis, the Court finds that the first prong of the Minnesota issue preclusion test is met.

### 2.      Finality

The state court's adjudication is also sufficiently "final" to be accorded preclusive effect in this proceeding. Even though the state court's summary judgment order is not immediately appealable because Judge Eagon denied summary judgment on one of plaintiffs' twelve claims,[10] issue preclusion can apply in the absence of an appealable final judgment. As numerous courts have found, including the Eighth Circuit, "finality

------------------------------

[10] The only claim that remains is plaintiffs' claim for breach of the duties of candor and loyalty.

- 18 -

for purposes of appeal under section 1291 is not necessarily the finality that is required for issue preclusion purposes." *John Morrell & Co. v. Local Union 304A,* 913 F.2d 544, 563 (8th Cir. 1990). In *John Morrell,* the union argued that the jury's liability verdict could not have preclusive effect because the damages phase of the trial had not been concluded and thus no final appealable judgment had been entered. *Id.* at 563. In rejecting the union's argument, the court explained that "[t]he availability of judicial review is merely one factor to consider in determining whether issue preclusion applies. . . . '[f]inality in the context [of issue preclusion] may mean little more than that the litigation of a particular issue has reached such a stage that a court sees no really good reason for permitting it to be litigated again.'" *Id.* (quoting *Lummus Co. v. Commonwealth Oil Refining Co.,* 297 F.2d 80, 89 (2d Cir. 1961)).

The Eighth Circuit's conclusion in *John Morrell* is consistent with decisions by numerous other courts and persuasive authoritative commentaries. *Ossman v. Diana Corp.,* 825 F. Supp. 870, 875-76 (D. Minn. 1993); *In re DEF Investments,* 186 B.R. 671, 683-685 (D. Minn. 1995) (rejecting the notion "that partial summary judgments can never constitute a sufficiently final judgment for purposes of collateral estoppel and, therefore, be accorded preclusive effect"); Restatement (Second) of Judgments 13 (stating that "for purposes of issue preclusion, 'final judgment' includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect"); 18 Wright & Miller, Federal Practice & Procedure § 4434 at 321 ("[r]ecent decisions have relaxed traditional views of the finality requirement by applying issue

preclusion to matters resolved by preliminary rulings or to determinations of liability not completed by an award of damages or other relief").

In this case, the state court's grant of summary judgment dismissing with prejudice plaintiffs' state statutory and common law fraud claims is "sufficiently firm" to be accorded preclusive effect. Plaintiffs' argument that the state court judgment is not a final order because it did not dispose of plaintiffs' entire case and did not satisfy the requirements of Minn. R. Civ. P. 54.02 is without merit in light of the discussion above. As the court in *DEF Investments* noted in rejecting precisely the same argument plaintiffs raise here, that argument "ignores the legal distinction which exists between a final judgment for purposes of preclusion and a final order or judgment for purposes of appeal." *Id.* at 684.

### 3.    Full and Fair Opportunity

Plaintiffs also had a full and fair opportunity to litigate their fraud claim in the state court. The issue of whether defendants' alleged misrepresentations and omissions constitute fraud were fully litigated and disputed in the state court litigation. Judge Eagon fully resolved that dispute on summary judgment in an extensive, well-reasoned opinion. *Bechtold*, 104 F.3d at 1068. Plaintiffs' allegation that they did not have a full and fair opportunity to litigate the fraud issue in the state court because they were not permitted any discovery does not preclude the Court from finding that an issue was "litigated" for collateral estoppel purposes. *DEF Investments,* 186 B.R. at 686 ("It is significant to note that the 'actually litigated' requirement does not necessarily require that an issue be 'thoroughly litigated.' If the parties to the original action disputed the

- 20 -

issue and the court resolved it, the doctrine of collateral estoppel is fully applicable no matter how slight the amount of evidence was on which a determination was rendered."); *Tobias,* 709 F. Supp. at 1270 (rejecting plaintiff's argument that expedited proceeding of summary judgment in state court without the benefit of discovery deprived them of a full and fair opportunity to litigate).

Finally, the Court notes that application of collateral estoppel in this case furthers the underlying twin purposes of the doctrine—conserving judicial resources and promoting federalism. As the court in *DEF Investments* observed:

> [P]recluding parties from contesting issues of law or fact that they have had a full and fair opportunity to litigate in a previous suit shields their adversaries "from the expense and vexation attending multiple lawsuit, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." (quoting *Montana v. United States,* 440 U.S. 147, 153-54 (1979) . . . . When issue preclusion is invoked in federal court to bar the relitigation of claims or issues previously adjudicated by a state court, the doctrine also serves to "promote the comity between state and federal courts that has been recognized as a bulwark of the federal system." (quoting *Allen v. McCurry,* 449 U.S. 90, 96 (1980).

*Id.* at 681-82. Thus, for all the foregoing reasons, the Court concludes that plaintiffs' 10b-5 claim asserted in Count I of its second amended complaint is precluded by the doctrine of collateral estoppel.

### III.   The Wexford Defendants' Motion to Dismiss

Although collateral estoppel is a sufficient basis upon which to grant Wexford's motion to dismiss,[11] the Court nevertheless addresses Wexford's argument that they are entitled to dismissal from this case because the second amended complaint does not plead sufficient particularized facts of wrongdoing by the Wexford defendants.

According to Wexford, the second amended complaint continues to carry forward the same fatal defect contained in plaintiffs' counterclaim, which is, that it still does not allege that any of the Wexford defendants said anything directly to plaintiffs.  It also fails to plead with any specificity the relationship between Wexford and Insight, or any agency relationship between Wexford on the one hand and Horing, Raghavendran, Grimaldi, or Murdoch on the other.  Instead, the complaint contains only vague and conclusory statements that Horing, Raghavendran, Grimaldi and Murdoch were agents of Wexford by lumping Wexford together with Insight as the "Venture Partners."  Complaint at ¶ 12. This type of general agency pleading, Wexford argues, is legally insufficient.

Plaintiffs submit that the second amended complaint adequately pleads an agency relationship between individuals Horing, Raghavendran, Grimaldi and the Wexford defendants as demonstrated by paragraphs 35 and 36 of the complaint, which provide:

> 35.  At all times material to this action, Raghavendran and Horing have been partners or principals of one or more of Insight Partners.  In addition, at all times material to this action, the Venture Partners were managed directly in part by Raghavendran and Horing as partners or

---

[11] Counsel for Wexford orally moved for dismissal on this basis at the motion hearing in response to the Court's observation that the Wexford defendants were parties to the state court litigation and thus collateral estoppel would equally apply to them.

indirectly through a management company in which Raghavendran and Horing were partners or managing agents.

36.   Starting in late 1998 or early 1999, the Venture Partners, and each of them, acting together, in concert with each other and in a common plan or scheme, authorized and directed Raghavendran, Horing and a third person, Greg Grimaldi ("Grimaldi"), to negotiate on behalf of the Venture Partners with DMR and its members.

When bringing a 10b-5 claim based on the fraudulent misrepresentations or omissions of a defendant's alleged agent, many courts have held that a plaintiff must plead the factual predicate for that agency relationship with particularity. *Lachmund v. ADM Investors Servs. Inc.,* 191 F.3d 777, 783 (7th Cir. 1999) (holding that general allegations of conspiracy were insufficient to allege an agency relationship between defendant and other defendants); *Adams v. NVR Homes, Inc.,* 193 F.R.D. 243, 250-52 (D. Md. 2000) (holding that plaintiff's general allegation that agent of one defendant "acted as a representative" for other named-defendants was insufficient because complaint "fails to indicate with particularity the factual predicate for the agency relationship"); *Kolbeck v. Lit America, Inc.,* 923 F. Supp. 557, 569-70 (S.D.N.Y. 1996) (vague assertions of agency insufficient to establish the facts establishing the agency relationship); *Gabriel Capital, L.P. v. NatWest Finance, Inc.,* 99 CIV 10488, 2000 LEXIS 15180 at *69 (S.D.N.Y. Oct. 18, 2000) (dismissing 10(b) claim against defendant NatWest Bank for plaintiff's failure to allege facts in complaint that third party NatWest Finance told plaintiff that it was acting as NatWest Bank's agent or on its behalf at the time the alleged misrepresentations were made).

The insufficient allegations found in *Lachmund, Adams,* and *Kolbeck* stand in contrast to the successfully pleaded agency relationship in *Gunderson v. ADM Investor Servs. Inc.,* No. 99-4032, 2000 WL 1154423 at *3 (8th Cir. Aug. 16, 2000) (unpublished opinion). In *Gunderson,* plaintiffs alleged that defendant ADM Investors Services ("ADMIS") knew or should have known that its agents were making fraudulent misrepresentations to plaintiffs (mostly Iowa farmers) in connection with certain hedging agreements. *Id.* at *1. The complaint alleged that ADMIS' agents included several Introducing Brokers (IBs) whose role it was to "'solicit commodity customer accounts and introduce those accounts to a Futures Commission Merchant such as ADMIS.'" *Id.* (quoting *Lachmund,* 191 F.3d at 780 n.1). The court reversed the district court's dismissal of plaintiffs' complaint for failure to allege with sufficient specificity the requisite agency relationship in its complaint. *Id.* at *3. Noting without deciding whether a plaintiff's agency allegations must satisfy the heightened pleading standard for allegations of fraud and mistake under Rule 9(b), the Eighth Circuit concluded that the plaintiffs' factual allegations satisfied even the higher pleading standard. *Id.*

A review of the factual allegations plead in *Gunderson* reveals the level of particularity necessary to properly plead an agency relationship. There, the plaintiffs plead with specificity facts indicating that ADMIS was "approving IBs' marketing materials and the content of the IBs' seminars, and insuring that IBS did not misrepresent the risks of trading, or sell illegal off-exchange futures contracts." *Id.* The complaint alleged further that "ADMIS had previously approved the content of seminars promoting HTA agreements . . . [and] that ADMIS approved the form of the contracts between

- 24 -

plaintiffs and defendant FAC-MARC, a commodity trading adviser that shared offices and corporate officers with defendant Agri-Plan (an IB)." *Id.*

The agency allegations contained in paragraphs 35 and 36 of plaintiffs' complaint against Wexford fall well short of the factual allegations contained in *Gunderson.* Rather, the Court finds the statements to be no more than the "bare legal conclusion of agency" courts found insufficient in *Lachmund, Adams,* and *Kolbeck.*[12]   For these reasons, the Court concludes that plaintiffs' second amended complaint fails to plead a fraud claim with sufficient particularity as to the Wexford defendants.

Finally, even if neither of the above-discussed grounds warranted granting defendants' motions, the Court finds that plaintiffs' second amended complaint fails to plead fraud with sufficient particularity under Rule 9(b) and the PSLRA.   Although plaintiffs have submitted a lengthier pleading than the first, the second amended complaint still suffers from many of the same deficiencies.   Granted, plaintiffs' second amended complaint avoids vaguely referring to "representatives of Insight" and more specifically alleges that "Raghavendran, Horing and Murdoch" or "Raghavendran, Horing and Grimaldi" made false and fraudulent representations to plaintiffs.   But the

---

[12]   The conspiracy-like allegations contained throughout the second amended complaint also fail as a matter of law.   *See* Complaint at ¶ 33 ("the principals of the Venture Partners decided to act together and in concert with each other in a common scheme or plan . . ."); at ¶ 37 ("the Venture Partners, and each of them, acting together, in concern with each other and in a common plan or scheme . . ."); at ¶ 52 ("In furtherance of this plan and scheme, the Venture Partners . . .").   In *Central Bank v. First Interstate Bank,* 511 U.S. 164 (1994), the Supreme Court held that a person could not be liable for violating section 10(b) simply by aiding and abetting another in committing securities fraud.   Courts since *Central Bank* have found that allegations of conspiracy or a common scheme do not create liability under section 10(b). *Dinsmore v. Squadron, Plesent, Sheinfeld & Sorkin,* 135 F.3d 837, 841-43 (2d Cir. 1998); *In re GlenFed, Inc. Sec. Litig.,* 60 F.3d 591, 592 (9th Cir. 1995).

complaint still lumps these speaking agents together as one, without specifically identifying who said what to whom and when. *In re Digi Int'l Inc. Sec. Litig.*, 6 F. Supp. 2d 1089, 1096 (D. Minn. 1998) (to satisfy the requirements of Rule 9(b), the complaint must specify the "who, what, when, where and how" of the alleged fraud); *In re Tricord Sys. Sec. Litig.*, Civ. No. 3-94-746, 1996 U.S. Dist. LEXIS 20943 at 53 (D. Minn. Apr. 5, 1996) (when allegedly fraudulent statements are oral, plaintiffs must particularize them and not rely on group pleading).

The complaint also fails to plead particular facts to support an inference that defendants' representations were false when made. The second amended complaint is replete with conclusory allegations of falsity and the only facts which plaintiffs do allege to create an inference of falsity are based on defendants' post-merger conduct. Neither approach is legally sufficient. *Grossman v. Novell*, 120 F.3d 1112, 1124 (10th Cir. 1997) (dismissing claims where "nowhere in the complaint are facts alleged showing that anything about these statements is false. Mere conclusory allegations of falsity are insufficient"); *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1430 (3d Cir. 1996) (dismissing plaintiffs' fraud claim where "[p]laintiffs simply mouth the required conclusion of law"); *DiLeo v. Ernst & Young,* 901 F.2d 624, 627-28 (7th Cir. 1990) ("Rule 9(b) required the district court to dismiss the complaint, which discloses none of the circumstances that might separate fraud from the benefit of hindsight. There is no "fraud by hindsight", in Judge Friendly's felicitous phrase, and hindsight is all the plaintiffs offer."); *Hillson Partners Ltd. P'ship v. Adage, Inc.*, 42 F.3d 204, 213 (4th Cir. 1994) ("hindsight does not establish fraud").

The same is true for plaintiffs' factual allegations relating to scienter. Again, the only facts plaintiffs allege to support their claim that defendants had a pre-existing plan at the time the alleged representations were made are based on actions taken by defendants **after** the transaction was completed. Otherwise, the complaint relies on the conclusory statements that defendants "knew that these representations were false at the time they were made." Complaint at ¶ 45. Plaintiffs' reliance on *Wharf (Holdings) Ltd. v. United Int'l Holdings, Inc.*, 121 S. Ct. 1776 (2001) is misplaced. The record in that case contained much more detailed, contemporaneous documentation supporting plaintiff's claim of a secret intent not to perform. *Id.* at 1779. It is the absence of allegations in the second amended complaint which could even possibly indicate such an intent which distinguishes this case from *Wharf*.

Thus, for all the foregoing reasons, the Court grants defendants Insight, Raghavendran, Horing and Wexford's motions to dismiss.

## ORDER

Based on the submissions of the parties, the arguments of counsel, and the entire file and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Insight Capital Partners II, LP, Insight Capital Partners III, LP, Insight Capital Partners (Cayman) II, LP, and Insight Capital Partners (Co Invest) III, LP's Motion to Dismiss [Docket No. 149] is **GRANTED**;

2.     Jeffery Horing and Ramanan Raghavendran's Motion to Dismiss [Docket No. 160] is **GRANTED**;

3.      WI Software Investors, LLC, Imprimis SB, LP, and W-E Investors, LLC's Motion to Dismiss [Docket No. 167] is **GRANTED**;

4.      eliance corporation's Motion to Dismiss [Docket No. 156] is **STAYED** pursuant to Notice of Bankruptcy [Docket No. 179].

5.      Count I of plaintiff's second amended complaint [Docket No. 146] is **DISMISSED WITH PREJUDICE.**

DATED: *September 21, 2001*
at Minneapolis, Minnesota.

_____
JOHN R. TUNHEIM
United States District Judge

- 28 -

# Please forward this announcement to the recipient of this fax.



# The United States District Court, District of Minnesota announces two new programs!

## Expedited Trials
–The Court will begin offering parties an opportunity to participate in a program called Expedited Trials beginning July 2, 2001. This voluntary program offers an alternative to traditional case processing by allowing for a shorter time period from filing to disposition.  Discovery and motion practice will be sharply limited as a means to reduce time and expense. Procedural rules are on the Court's website at www.mnd.uscourts.gov. If you would like additional information about the Expedited Trials Program, contact one of our clerk's offices at the phone numbers listed below.

## Courtroom Technology – Phase II
– In June 2001, the District of Minnesota began upgrading, installing, and enhancing the technology available to counsel in the courtroom. The project will continue through early fall and will ultimately upgrade all Article III Judge courtrooms in St. Paul and Minneapolis. To assist counsel with this transition, the District Court is offering a hands-on class, worth one hour of CLE credit at both courthouses. Classes will be held over the lunch hour. Course registration can be done by visiting www.mnd.uscourts.gov or by calling Kristine at 612-664-5125.

# For additional information on either program please visit our website at www.mnd.uscourts.gov.



| 700 Federal Building | 202 U.S. Courthouse | 417 U. S. Courthouse |
|---|---|---|
| 316 North Robert Street | 300 South Fourth Street | 515 West First Street |
| St. Paul, MN 55101 | Minneapolis, MN 55415 | Duluth, MN 55802 |
| (651) 848-1100 | (612) 664-5000 | (218) 529-3500 |